**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUSANA KASZIRER, Derivatively on Behalf of Nominal Defendant DOUBLEVERIFY HOLDINGS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MARK ZAGORSKI, NICOLA ALLAIS, DAVIS NOELL, LAURA DESMOND, LUCY DOBRIN, SUNDEEP JAIN, ROSIE PEREZ, GARY SWIDLER, KELLI TURNER, and SCOTT WAGNER,<br><br>Defendants,<br><br>and<br><br>DOUBLEVERIFY HOLDINGS, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

By and through her undersigned counsel, Plaintiff Susana Kaszirer ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant DoubleVerify Holdings, Inc. ("DoubleVerify" or the "Company") and against certain current and former officers and directors of the Company for (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) unjust enrichment; (iv) abuse of control; (v) gross mismanagement; and (vi) insider selling and misappropriation of information. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public

filings made by DoubleVerify and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on DoubleVerify's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re DoubleVerify Holdings, Inc. Securities Litigation*, Case No. 25-cv-04332 (S.D.N.Y.) (the "Related Securities Action"); and (e) review of other publicly available information concerning DoubleVerify and the Defendants.

## NATURE OF THE ACTION

1. Plaintiff brings this action derivatively for the benefit of Nominal Defendant DoubleVerify against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately November 10, 2023, to the present (the "Relevant Period").[1]

2. DoubleVerify, founded in 2008, is focused primarily on measuring both the quality and performance of digital ads after they are purchased and deployed by advertisers ("Measurement Services"). The Measurement Services provide advertisers with data to help

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately November 10, 2023, to February 27, 2025; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

them verify that their ads are being viewed in a fraud-free and brand suitable environment, which includes metrics pertaining to viewability, fraud detection, brand safety, and sustainability.

3. DoubleVerify has since expanded into advertising optimization services, a process by which the Company uses artificial intelligence ("AI") to assist in obtaining the desired ad placement outcomes for global brands ("Activation Services"). These Activation Services have been primarily driven towards ads purchased through programmatic auctions on open ad exchanges. The Activation Services provide substantially higher profit margins for DoubleVerify than Measurement Services, as they are priced at a premium.

4. Prior to the Relevant Period, advertisers discovered a significant increase in ad impressions being displayed to robotic agents ("bots") as opposed to real human consumers. As generative AI technology has improved, it has become much easier for third parties to generate seemingly authentic user agents in the form of bots, and these bots are capable of generating significant ad impressions that appear to be from real human consumers. Because of this, it is possible for bad actors to use invalid bot traffic schemes to create false data patterns. DoubleVerify's technology could not adequately discern real human user traffic from bot traffic, making the Company's Activation Services on open ad exchanges less useful to advertisers.

5. These invalid bot traffic schemes have caused many advertisers to move their ads from open exchanges to closed platforms, including private marketplaces operated by large technology companies such as Meta Platforms, Google, TikTok, and Amazon, where access to data is heavily restricted and expensive for third-party verification companies like DoubleVerify to integrate into its Activation Services. This industry change negatively impacted DoubleVerify's margins and profits leading up to the Relevant Period.

6. Throughout the Relevant Period, Defendants (defined below), made a series of false and/or misleading statements and failed to disclose materially adverse facts, including: (i) DoubleVerify's customers were moving their ad spending from open exchange to closed platforms where the Company's technological capabilities were limited and competed directly with native tools provided by those platforms including Meta Platforms and Amazon; (ii) DoubleVerify's ability to monetize its Activation Services was limited due to the significant expense on the development of technology for closed platforms; (iii) DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize; (iv) DoubleVerify's competitors were in a better position to incorporate AI into their offerings on closed platforms, which hindered DoubleVerify's ability to compete and impacted their profits; (v) DoubleVerify overbilled its customers for ad impressions served to bots operating out of known data center server farms; (vi) DoubleVerify's risk disclosures were materially false and misleading because they characterized existing adverse facts as possibilities, when those facts had already began to impact the Company; and (vii) as a result, the Defendants positive statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

7. The truth began to emerge on February 28, 2024, when DoubleVerify issued lower revenue growth expectations for the first quarter of 2024 due to "a slow start by brand advertisers and a slow ramp by recently signed new large customers." Following this news, DoubleVerify's stock price dropped $8.35 per share, or approximately 21.3% to a closing price of $30.89 on February 29, 2024.

8. On May 7, 2024, DoubleVerify cut its full-year 2024 revenue outlook due to customers reducing their ad spending. On this news, DoubleVerify's stock price dropped $11.79 per share, or 38.6% to a closing price of $18.78 on May 8, 2024.

9. On February 27, 2025, DoubleVerify reported lower-than-expected fourth quarter 2024 sales and earnings due in part to reduced customer spending. Defendants further disclosed that the shift of ad dollars from open exchanges to closed platforms was negatively impacting the Company. On this news, DoubleVerify's stock price fell approximately 36% to close at $13.90 on February 28, 2025.

10. Finally, on March 28, 2025, market research company Adalytics Research, LLC ("Adalytics") released a report claiming that DoubleVerify's web advertisement verification and fraud protection services were ineffective and that the Company's customers were regularly billed for ad impressions served to declared bots operating out of known data center server farms. On that same day, *The Wall Street Journal* reported that DoubleVerify regularly missed detection of non-human traffic, contradicting the Company's claims that it helps brands avoid serving ads to non-human bot accounts.

11. As a result of Defendants' wrongful acts and omissions, which caused considerable declines in the market value of the Company's stock, Stockholders and the Company have suffered significant damages.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

14. Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

### A. Plaintiff

15. Plaintiff was a shareholder during the Relevant Period, and has continuously been a shareholder of DoubleVerify common stock.

### B. Nominal Defendant

16. Nominal Defendant DoubleVerify is incorporated in Delaware and its current principal executive offices are located at 462 Broadway, New York, New York, 10013. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "DV".

### C. Defendants

17. Defendant Mark Zagorski ("Zagorski") serves as the Company's Chief Executive Officer ("CEO") and has served as a member of the Company's Board of Directors (the "Board") since October 2021. For the fiscal years of 2023 and 2024, Defendant Zagorski

received $10,810,668 and $1,077,618 in total compensation, respectively.[2] Zagorski is named as a defendant in the related securities action.

18. Defendant Nicola Allais ("Allais") serves as the Company's Chief Financial Officer ("CFO"). For the fiscal years of 2023 and 2024, Defendant Allais received $4,611,628 and $761,968 in total compensation, respectively. Allais is named as a defendant in the related securities action.

19. Defendants Zagorski and Allais are collectively referred to herein as the "Securities Action Defendants."

20. Defendant Davis Noell ("Noell") is the Chairperson of the Board and has served on the Company's Board since 2017. Noell is a member of both the Compensation Committee and the Nominating and Corporate Governance Committee. For the fiscal year of 2024, Defendant Noell received $312,503 in total compensation.

21. Defendant Laura Desmond ("Desmond") has served on the Company's Board since 2017. Desmond is Chair of the Nominating and Corporate Governance Committee and is a member of the Compensation Committee. For the fiscal years of 2023 and 2024, Defendant Desmond received $252,486 and $262,766 in total compensation, respectively.

22. Defendant Lucy Dobrin ("Dobrin") has served on the Company's Board since 2017. For the fiscal year of 2024, Defendant Dobrin received $240,003 in total compensation.

23. Defendant Sundeep Jain ("Jain") has served on the Company's Board since 2022. Jain is a member of the Compensation Committee. For the fiscal years of 2023 and 2024, Defendant Jain received $242,486 and $247,503 in total compensation, respectively.

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

24. Defendant Rosie Perez ("Perez") has served on the Company's Board since 2021. Perez is Chair of the Audit Committee and is a member of the Nominating and Corporate Governance Committee. For the fiscal years of 2023 and 2024, Defendant Perez received $244,986 and $265,003 in total compensation, respectively.

25. Defendant Gary Swidler ("Swidler") has served on the Company's Board since 2024. Swidler is a member of the Audit Committee. For the fiscal year of 2024, Defendant Swidler received $449,984 in total compensation.

26. Defendant Kelli Turner ("Turner") has served on the Company's Board since 2021. Turner is a member of the Audit Committee. For the fiscal years of 2023 and 2024, Defendant Turner received $249,325 and $260,336 in total compensation, respectively.

27. Defendant Scott Wagner ("Wagner") has served on the Company's Board since 2021. Wagner is Chair of the Compensation Committee and is a member of the Nominating and Corporate Governance Committee. For the fiscal years of 2023 and 2024, Defendant Wagner received $249,325 and $260,003 in total compensation, respectively.

28. Defendants Zagorski, Noell, Desmond, Dobrin, Jain, Perez, Swidler, Turner and Wagner are collectively referred to herein as the "Director Defendants."

29. The Director Defendants along with the Securities Action Defendants are referred to collectively herein as the "Individual Defendants."

30. The Individual Defendants along with DoubleVerify are referred to collectively herein as "Defendants."

**D. Related Party Non-Defendants**

31. Related Party Non-Defendant Jennifer Storms ("Storms") has served on the Company's Board since June 2025. Storms is named solely for the purpose of demand futility.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32. By reason of their positions as officers, directors, and/or fiduciaries of DoubleVerify, and because of their ability to control the business and corporate affairs of DoubleVerify, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage DoubleVerify in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of DoubleVerify and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33. Each director and officer of the Company owes to DoubleVerify and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

34. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

35. Pursuant to the Audit Committee Charter of DoubleVerify (amended as of October 30, 2024)[3], the purpose of the Audit Committee is as follows:

---

[3] Available at https://s206.q4cdn.com/961864615/files/doc_downloads/gov_doc/DV-Audit-Committee-Charter-2024.pdf.

> The primary purposes of the Committee are: (a) to assist the Board in overseeing (i) the quality and integrity of the Company's financial statements, (ii) the qualifications, independence and performance of the Company's independent auditor, (iii) the performance of the Company's internal audit function and (iv) the Company's compliance with legal and regulatory requirements; and (b) to prepare the report of the Committee required to be included in the Company's annual proxy statement under the rules of the U.S. Securities and Exchange Commission (the "SEC").

36. Concerning Financial Reporting and Disclosure Matters, the Audit Committee Charter states:

> (k) The Committee shall meet to review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's reviews of the Company's quarterly financial statements;
>
> (l) The Committee shall review and discuss with management and the independent auditor:
>
> (i) prior to the annual audit, the scope, planning and staffing of the annual audit;
> (ii) the authority, support and access of the Company's audit function to the Company's personnel, facilities and records;
> (iii)significant issues regarding accounting and auditing principles and practices and financial statement presentations, including all critical accounting policies and estimates, any significant changes in the Company's selection or application of accounting principles and any significant issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;
> (iv)analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;
> (v) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements;
> (vi)any significant changes to the Company's auditing and accounting principles and practices suggested by the independent auditor, internal audit personnel or management; and

(vii) management's internal control report prepared in accordance with rules promulgated by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

(m) The Committee shall recommend to the Board whether the annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

(n) The Committee shall discuss with management the Company's practices regarding earnings press releases and the provision of financial information and earnings guidance by management to analysts and ratings agencies.

(o) The Committee shall periodically review and discuss with management the Company's guidelines and policies with respect to the process by which the Company undertakes risk assessment and risk management, including discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

(p) The Committee shall review and discuss with the Chief Executive Officer (the "CEO") and the Chief Financial Officer (the "CFO") the procedures undertaken in connection with the CEO and CFO certifications for the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, including their design and evaluation of the Company's disclosure controls and procedures and internal control over financial reporting.

(q) The Committee shall review any disclosures made by the CEO and CFO with regards to significant deficiencies in the design or operation of internal controls or any fraud that involves management or other employees who have a significant role in the Company's internal controls.

(r) The Committee shall annually obtain from the independent auditor assurance that the audit was conducted in a manner consistent with Section 10A of the Exchange Act.

(s) The Committee shall exercise such other powers and perform such other duties and responsibilities as are incidental to the purposes, duties and responsibilities specified herein and as may from time to time be delegated to the Committee by the Board.

37. Concerning Internal Audit, Compliance Matters and Other:

(u) The Committee shall review the appointment and termination of senior internal audit personnel, and review all significant reports to management prepared by internal audit personnel, and management's responses.

(v) The Committee shall establish and maintain procedures for:

(i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and

(ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

(w) The Committee shall review with management and the independent auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies.

(x) The Committee shall review with the Company's Chief Legal Officer any legal matters that may have a material impact on the financial statements or the compliance policies of the Company and its subsidiaries, and any material reports or inquiries received by the Company or any of its subsidiaries from regulators or governmental agencies.

(y) The Committee shall review and approve all related person transactions of the Company in accordance with Item 404 of Regulation S-K and the policies of the Company in effect from time to time.

(z) The Committee shall review with management the Company's Code of Ethics and Code of Conduct.

(aa) The foregoing list of duties is not exhaustive, and the Committee shall, in addition, exercise such other powers and perform such other duties and responsibilities as are incidental to the purposes, duties and responsibilities specified herein and as may from time to time be delegated to the Committee by the Board.

38. Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**<u>Duties Pursuant to the Company's Code of Business Conduct</u>**

39. The Individual Defendants, as officers and/or directors of DoubleVerify, were also bound by the Company's Code of Business Conduct (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of DoubleVerify, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

40. Regarding the basic purpose of the Code, the Code states the following:

> The Code is an expression of our core values and represents a framework for decision making. To this end, Covered Persons are responsible for understanding the Code and acting in accordance with it. The Code cannot and is not intended to cover every applicable law, rule or regulation or provide answers to all questions that may arise; for that, we must ultimately rely on each Covered Person's good sense of what is right, including a sense of when it is proper to seek guidance from others with respect to the appropriate course of conduct. Questions regarding any law, rule, regulation or principle discussed in this Code which may govern business conduct, should be directed to your supervisor, the Chief Legal Officer of the Company (the "Chief Legal Officer") or the confidential DV Speaks Up reporting service at 1-800-454-2134 or www.DVSpeaksUp.com.

41. Concerning "Compliance with Laws, Rules & Regulations," the Code states the following:

> Covered Persons are required to comply fully with all laws, rules and regulations affecting the Company's business and its conduct in business matters. The Company conducts its business globally where applicable laws, rules, regulations, customs and social requirements may be different from those in the United States. It is the Company's policy to abide by the national and local laws of our host nations and communities. The fact that in some countries certain standards of conduct are legally prohibited, but these prohibitions are not enforced in practice, or their violation is not subject to public criticism or censure, will not excuse any illegal action by a Covered Person. In the case of any conflict between foreign and United States law, or in any situation where a Covered Person has a doubt as to the proper course of conduct, it is incumbent upon a Covered Person to immediately consult the Chief Legal Officer.

---

[4] Available at https://s206.q4cdn.com/961864615/files/doc_downloads/gov_doc/Pixel-Code-of-Business-Conduct.pdf.

> Beyond the strictly legal aspects involved, Covered Persons at all times are expected to act honestly and maintain the highest standards of ethics and business conduct, consistent with the professional image of the Company.

42. Concerning "Fair Dealing," the Code states the following:

> The Company's success depends on building productive relationships with one another and third parties based on honesty, integrity, ethical behavior and mutual trust. Every Covered Person should endeavor to deal fairly with each of our customers, suppliers, partners, competitors and other Covered Persons. No Covered Person should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practices.

43. Concerning "Insider Trading," the Code states the following:

> As insider trading is a violation of this Code, the Company's Insider Trading Policy and federal and state laws, Covered Persons should review this Code and the Company's Insider Trading Policy before trading in securities and direct all questions and concerns to the Chief Legal Officer.

44. Concerning the "Quality of Disclosures," the Code states the following:

> Federal and state securities laws impose continuing disclosure requirements on the Company and require the Company to regularly file certain reports with and make certain submissions (the "Reports") to the U.S. Securities and Exchange Commission and the New York Stock Exchange and disseminate them to the Company's shareholders. Such Reports must comply with all applicable legal and exchange requirements and may not contain material misstatements or omit material facts.
>
> All (i) Covered Persons directly or indirectly involved in preparing such Reports, (ii) any Covered Persons who regularly communicate with the press, investors and analysts concerning the Company and (iii) all representatives who assist the Company in preparing such Reports and communications will ensure that such Reports and communications are full, fair, timely, accurate and understandable and meet all legal requirements. This policy applies to all public disclosure of material information about the Company, including written disclosures, oral statements, visual presentations, press conferences and media calls.

45. Concerning the "Reporting of Illegal or Unethical Behavior," the Code states the following:

> Any Covered Person who is aware of any illegal or unethical behavior or who believes that an applicable law, rule or regulation or this Code has been violated,

must promptly report the matter to the Chief Legal Officer. In addition, a Covered Person who has a concern about the Company's accounting practices, internal controls or auditing matters should report his or her concerns to the Chief Legal Officer. Any Covered Person wishing to make a report with respect to any of these matters anonymously, or to discuss a sensitive issue or question, may contact the Company's confidential DV Speaks Up reporting service at 1-800-454-2134 or www.DVSpeaksUp.com. Covered Persons should take care to report violations to a person who they believe is not involved in the matter giving rise to the violation. All reports of violations will be promptly investigated and, if appropriate, remedied, and if legally required, immediately reported to the proper governmental authority.

Covered Persons will be expected to cooperate in assuring that violations of the Code are promptly addressed. The Company has a policy of protecting the confidentiality of those making reports of possible misconduct to the maximum extent possible, consistent with the requirements necessary to conduct an effective investigation and the law. In no event will there be any retaliation against someone for reporting an activity that he or she in good faith believes to be a violation of any law, rule, regulation or this Code. Any supervisor or other Covered Person intimidating or imposing sanctions on a Covered Person for reporting a matter will be disciplined up to and including termination.

Covered Persons should know that it is a crime to retaliate against a person, including with respect to their employment, for providing truthful information to a law enforcement officer relating to the possible commission of any federal offense. Covered Persons who believe that they have been retaliated against by the Company, its employees, contractors, subcontractors or agents, for providing information to or assisting in an investigation conducted by a federal agency, Congress or a person with supervisory authority over the Covered Person (or another Covered Person who has the authority to investigate or terminate misconduct) in connection with conduct that the Covered Person reasonably believes constitutes a violation of federal criminal fraud statutes or any rule or regulation of the Securities and Exchange Commission, may file a complaint with the Secretary of Labor, or in federal court if the Secretary of Labor does not take action in a timely manner.

46. Concerning "Responding to Improper Conduct," the Code states:

This Code will be enforced on a uniform basis for everyone, without regard to a Covered Person's position within the Company. If a Covered Person violates the Company's Code, he or she will be subject to disciplinary action. Supervisors and managers of a disciplined Covered Person may also be subject to disciplinary action for their failure to properly oversee [a] Covered Person's conduct, or for retaliation against [a] Covered Person who reports a violation(s).

> The Company's response to misconduct will depend upon a number of factors including whether the improper behavior involved illegal conduct. Disciplinary action may include, but is not limited to, reprimands and warnings, probation, suspension, demotion, reassignment, reduction in salary or immediate termination. Covered Persons should be aware that certain actions and omissions prohibited by the Code might be crimes that could lead to individual criminal prosecution and, upon conviction, to fines and imprisonment.

47. Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Control, Access, and Authority**

48. The Individual Defendants, because of their positions of control and authority as directors and/or officers of DoubleVerify, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DoubleVerify.

49. Because of their advisory, executive, managerial, and directorial positions with DoubleVerify, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of DoubleVerify.

50. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of DoubleVerify and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

51. To discharge their duties, the officers and directors of DoubleVerify were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of DoubleVerify were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how DoubleVerify conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that DoubleVerify was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

52. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to DoubleVerify and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of DoubleVerify, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of DoubleVerify, the absence of good faith on their part, and a reckless disregard for their duties to DoubleVerify and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to DoubleVerify.

53. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

54. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, DoubleVerify has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

55. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

57. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust

enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

58. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

60. DoubleVerify provides data analytics services that help brands, agencies, and publishers verify that their digital advertising investments are delivered as intended with desired results.

61. DoubleVerify generates revenue primarily through two categories of services: (i) Measurement Services; and (ii) Activation Services. Measurement Services provide advertisers with analytics to measure the effectiveness of their digital advertisements, including whether ads are delivered in brand-safe environments, are fully viewable, and reach real people in the intended geography. The Company generates Measurement Services revenue from fees earned

on a large volume of low-value transactions, which are highly automated and based on contractual terms with advertisers.

62. DoubleVerify's Activation Services enable advertisers to optimize their campaigns by leveraging measurement data to drive desired ad placement outcomes for global brands. These services include AI-powered optimization tools like Scibids AI, which optimizes campaign performance, and Authentic Brand Suitability ("ABS"), which helps advertisers avoid unsuitable content. Activation Services revenue is generated from evaluating and purchasing ad inventory through programmatic demand-side platforms ("DSPs") like The Trade Desk, Inc. and social media platforms like TikTok and Instagram. Customers pay the Company a fee for the successful execution of advertisement purchases.

63. DoubleVerify's Measurement Services on platforms like Instagram are often a prerequisite for the use of optimization tools via DoubleVerify's Activation Services. The Company's Measurement Services are often the entry point for customers, with Activation Services being upsold once measurement is in place. For example, 70 percent of DoubleVerify's top 500 customers have adopted ABS, demonstrating the interconnected nature of these services. The Company's Activation Services are priced at a premium and generate substantially higher profit margins than Measurement Services in connection with advertising placed through an open exchange.

64. Prior to the Relevant Period, advertisers began to experience a sharp increase in internet traffic from advertising impressions served to bots rather than to humans. The proliferation of generative AI became a key factor in the rapid evolution of invalid bot traffic schemes, making it easier for bad actors to falsify data patterns. Because DoubleVerify's

technology could not adequately filter out this invalid bot traffic, the Company's Activation Services on open ad exchanges had become less useful to advertisers.

65. These invalid traffic schemes have pushed many advertisers from placing their ads on open exchanges to closed platforms, where access to data is heavily restricted and expensive for third-party verification companies like DoubleVerify to integrate into its Activation Services. Leading up to the Relevant Period, this industry shift to closed platforms had already begun to negatively impact DoubleVerify's margins and profits.

**False and Misleading Statements During the Relevant Period**

66. The Relevant Period began on November 10, 2023, the day after DoubleVerify issued a press release announcing its results for the third quarter ended September 30, 2023 (the "Q3 2023 Earnings Report"). In the Q3 2023 Earnings Report, DoubleVerify touted its "***recent customer wins as demand for our solutions rose across key digital media environments***." The Q3 2023 Earnings Report also highlighted quarterly revenue of "***$144.0 Million Driven by Global Growth in Social, CTV Measurement and Programmatic Activation***."[5]

67. On the same day the Q3 2023 Earnings Report was issued, the Company filed with the SEC a Form 10-Q reporting the Company's financial results for the third quarter of 2023 (the "Q3 2023 10-Q"). In the Q3 2023 10-Q, the Company stated that "There have been no material changes to the risk factors described in the section titled 'Risk Factors' in the Annual Report on Form 10-K for the year ended December 31, 2022 ("2022 10-K") and the Quarterly Report on Form 10-Q for the quarter ended March 31, 2023." The 2022 10-K contained the following risk factor concerning the ability of DoubleVerify to remain competitive:

---

[5] Emphasis added unless otherwise noted.

> ***If we fail to respond to technological developments or evolving industry standards, our solutions may become obsolete or less competitive.***
>
> Our future success will depend in part on our ability to develop new solutions and modify or enhance our existing platform in order to meet customer needs, add functionality and address technological advancements. To remain competitive, ***we will need to continuously upgrade our existing platform and develop new solutions that address evolving technologies and standards across all major channels, formats and devices for digital advertising***, including mobile, social, video, in-app, display and connected television, as well as across digital media buying platforms, such as programmatic, direct ad exchanges and trading networks. We may be unsuccessful in upgrading our existing platform or identifying new solutions in a timely or cost-effective manner, or we may be limited in our ability to develop or market new or upgraded solutions due to patents held by others. In addition, any new product innovations may not achieve the market penetration or price levels necessary for profitability. ***If we are unable to develop timely enhancements to, and new features for, our existing platform or if we are unable to develop new solutions that align with advertiser demands as priorities shift or keep pace with rapid technological developments or changing industry standards, the solutions we deliver may become obsolete, less marketable and less competitive, and our business, financial condition and results of operations may be adversely affected.***

68. The 2022 10-K also contained the following risk factor concerning the use of activation services in private platforms by DoubleVerify's customers:

> We also cannot assure you that our customers will continue to use our solutions available on these digital media platforms. Some of our integration partners have developed products that compete with us and we cannot assure you that other partners will not also develop competing products in the future. ***If our customers stopped using our solutions on these digital media platforms or if our integration partners decide to cease integrating our solutions, our business, financial condition and results of operations could be adversely affected***.

69. On the same day the Q3 2023 Earnings Report was issued, the Company hosted an earnings call (the "Q3 2023 Call"). During the Q3 2023 Call, Defendant Zagorski stated that:

> In programmatic, ***we continue to ensure that our advertiser customers have access to all of our pre-bid verification solutions anywhere they buy media by scaling our activation solutions across emerging demand side platforms***. In the quarter, we launched a new DSP integration with LoopMe and expanded pre-bid solutions on Zeta Global, DeepIntent, Basis, Comcast-Beeswax and Criteo's Commerce Max DSPs, ***widening the distribution of our industry-leading activation solutions***.

70. On November 14, 2023, Defendant Zagorski and Defendant Allais participated in the RBC Capital Markets Global Technology, Internet, Media, Telecommunications Conference (the "November 2023 Call"). In response to a question about DoubleVerify's outlook for 2024, Defendant Zagorski stated:

> When we look at 2024, the new story, there is the news feed, right? So currently on Meta – on Facebook, we do what's called invalid traffic analysis and viewability analysis on the news feed, where arguably almost all the traffic goes. We are testing right now brand safety and suitability measurement on the news feed, and we expect to launch that sometime in early 2024. ***That will provide significant growth opportunities for us moving ahead as we expand that to an entirely new customer base and expand with our current customers across that***.
>
> And when we launch on news feed, we'll also be launching brand safety and suitability across Instagram and across the reel – of Facebook reels as well. So we've got lots of different catalysts pushing social ahead and I think, the last thing I'll note there is you also have macro environment changes with regard to cookie deprecation and more – more advertisers looking to be able to close the loop, which lends them to walled gardens and social.

71. During the November 2023 Call, in response to a question about DoubleVerify's growth opportunities, Defendant Zagorski stated:

> We look at retail media as being a driver of all three of our revenue lines. So, we report on what's called Activation, which is pre-bid revenue, Measurement, which is post-bid or after the ads been purchased and then platform revenue, which is we kind of take our products and sell them base versions of them to platforms to filter their inventory. Retail media has helped drive all of those, so think of it as we designate certain types of transactions in each of those three line items as retail media transactions. ***Last quarter, we saw 75% growth across those lines***. And we work with folks like Amazon, Walmart, Macy's, Target, BestBuy. Everyone has a retail media network these days. Dollar General has one now, in case you're in the Dollar store business.
>
> So, I think it's an interesting opportunity for us for growth because as we noted earlier, ***as cookies start to get deprecated in the open market, these retail media networks provide an interesting opportunity for advertisers to look to close the loop by taking first party data from retailers using that, if you're an OEM to target advertisers outside of that, that website. So, it creates new opportunity there***.

72. On December 4, 2023, Defendant Zagorski and Defendant Allais participated in the Raymond James Technology and Consumer Conference (the "December 2023 Call"). During the conference, Defendant Zagorski stated that "***We ensure that the ad spend is delivered in a safe effective manner to the real person in a real safe digital marketing platform***." Defendant Zagorski was also asked about DoubleVerify's Activation Services revenue:

> Q: Andrew Marok, Raymond James: Let's shift to activation. So, authentic brand suitability or ABS kind of remained an important revenue contributor to the segment, up 40% year-over-year, kind of building on years of ramp. What's driving the growth for that product specifically and expectations on sustainability of current growth rates for ABS?
>
> A: Defendant Zagorski: Yeah. ABS is a wonderful solution for us. It's over five years old. And as you noted, it grew 40% last quarter for a five-year-old product and not on small numbers, on big numbers. I think ABS is a great example of how our products have progressed from being protection to helping drive performance.
>
> Going back to how we started this conversation, ABS is a pre-filtering solution for programmatic. So, it's integrated into places like The Trade Desk and Google's DV 360. Allows advertisers to turn that knob very finely on a campaign-by-campaign basis to filter out impressions, not even bid on impressions that don't make sense for them, right? So, rather than try to block something that I already bought or report back to me if there is a violation, keep me from buying it in the first place. And that's what ABS does. ***And when we look at the growth drivers, that 40% growth, 85% of it came from current customers, right***? I think it's 85%. Yeah. I'm looking, I'm looking, I am the person, just make sure I get the number right.
>
> ***So, it's current customer growth***. And to me, that is awesome, because that shows that people who are using it today know it works. And not just because it protects them, but is helping to drive performance, right? They're taking bad stuff out of the system. ***And in programmatic, you can see what works really instantly. So, if it wasn't working and it's a premium price product, let me charge almost 2.5 times more for that solution than we do for some of our measurement solutions. So, people are paying more for it. They're using it more. And it's still growing after five years means it works. It's driving performance***.
>
> So, we're excited about ABS. It continues to grow. Brands continue to launch it in new markets, across new lines of business. And it's a solution that I think is unparalleled in the industry. ***There's no comparative solution***.

73. During the December 2023 Call, Defendant Allais was also asked about DoubleVerify's expanded Activation Services across additional walled garden platforms:

> It is understood that a third-party independent verifier should be available in the walled gardens. TikTok contributed a lot to that because they started saying, yes, we want verification. And once that happened, Facebook sort of had to be able to provide a similar offering on their platform.
>
> So I think we're already there. What's – the secret sauce for us is knowing the walled garden space, right, because every time there's an integration, you really need to understand how it works, specifically for each walled garden out there. ***And that's the part where I think years of us having worked with them makes it very easy for us to continue our coverage whenever a new volume becomes available. But we're kind of already at the stage where it is understood that verification should be available in the walled gardens***.

74. On January 17, 2024, Defendant Zagorski and Defendant Allais participated in the Needham Growth Conference (the "January 2024 Call"). Defendant Zagorski was asked about DoubleVerify's Activation Services revenue:

> Q: Laura Martin, Needham Securities: Talk about how you think – I'm going to focus on the economics, but why don't you talk about strategically across the business how you think Scibids helps overall DoubleVerify increase its market share and drive economics, which is what I actually care about?
>
> A: Defendant Zagorski: Yeah, for sure. I mean, Scibids is a really exciting acquisition for us and it fits perfectly into our long-term strategic goals. And we're not too far in the weeds here, but ***if you think about what we do and what we call our activation business, which is over 50% of our revenue***. Activation, as Nicola noted, is the ability to filter out bad behavior, bad stuff before someone even buys it. And we do that on the pre-bid side through platforms like Trade Desk and Xandr and Google and all the big GSVs, Amazon, right?
>
> [...]
>
> ***We have advertisers that work with our competitors for measurement are coming to us on performance tools, because our competitors don't have anything comparable***.

75. During the January 2024 Call, Defendant Zagorski also made the following statement about DoubleVerify's relationship with walled gardens:

> ***Our relationship with walled gardens is very strong and will continue to grow***. And I think it goes back to that second thing. I said we want to make sure that we expand our presence across platforms, because wherever dollars go from an advertising perspective, we want to be there and verify it, and so that we don't get concerned about a shift from one platform to another or from one country to another. And I think that's where we want to be.

76. The statements above were materially false and misleading when made because they failed to disclose the following adverse facts that existed at the time they were made:

a) DoubleVerify's customers were shifting their ad spending from open exchanges to closed platforms, where the Company's technological capabilities were limited and competed directly with native tools provided by platforms like Meta Platforms and Amazon;

b) DoubleVerify's ability to monetize on its Activation Services was limited because the development of its technology for closed platforms was significantly more expensive and time-consuming than disclosed to investors;

c) DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize;

d) DoubleVerify's competitors were better positioned to incorporate AI into their offerings on closed platforms, which impaired DoubleVerify's ability to compete effectively and adversely impacted the Company's profits;

e) DoubleVerify systematically overbilled its customers for ad impressions served to declared bots operating out of known data center server farms;

f) DoubleVerify's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

**g)** as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

**The Truth Emerges**

77. Investors began to learn the truth about this fraud on February 28, 2024, when DoubleVerify lowered its first quarter 2024 revenue guidance due to "a slow start by brand advertisers and a slow ramp by recently signed new large customers." On this news, DoubleVerify's stock price dropped $8.35 per share, or approximately 21.3%, from a closing price of $39.24 on February 28, 2024, to a closing price of $30.89 on February 29, 2024.

78. While this news partially revealed Defendants' fraud, Defendants continued to mislead investors. On February 28, 2024, DoubleVerify issued a press release announcing its results for the fourth quarter and full year ended December 31, 2023. In the press release, DoubleVerify touted its yearly revenue of "***$572.5 Million Driven by Global Growth in Social, CTV Measurement and Programmatic Activation***."

79. On the same day, the Company hosted an earnings call for the fourth quarter of 2023 and the full year (the "Q4 2023 Call"). On the Q4 2023 Call, Defendant Zagorski made the following statement about DoubleVerify's Activation Services:

> In addition, we've leaned into our customer acquisition and retention plan of building higher value, more strategic customer engagements that leverage our real time data to drive superior outcomes and ROI. Over the last four years, DV has more than doubled the number of customers and revenue, while increasing our overall MTF and expanding the bundle of solutions our customers use from us. ***As media performance joins media quality protection as a core part of our superior value proposition, closed loop optimization leveraging data partnerships like we have with Attain, fueled by data insights from Scibids AI, and activated via proprietary solutions like ABS, will help us to further enhance our premium value position in the marketplace, elevate and differentiate the level of our customer engagements, and set DV up for continued future market share growth***.

80. The same day, the Company filed with the SEC a Form 10-K reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10- K"). The 2023 10-K contained the same risk disclosures discussed above.

81. On March 6, 2024, Defendant Zagorski and Defendant Allais participated in the KeyBanc Emerging Technology Summit. Defendant Zagorski was asked about DoubleVerify's Activation Services revenue:

> So, ***if you look at the core fundamentals of our activation business***, ***it's always been about trying to help an advertiser avoid certain types of content that aren't going to work for them, right***. Get garbage out of the system and what's left will work better.
>
> We started that with what we call, let's say, basic brand safety, which was a very stiff yes or no based on very specific criteria. Was this safe or not safe, right. ABS was the evolution of that. So, we say we went from static to dynamic and ABS allowed us to say, okay, let's create brand suitability tiers, so not just brand safety, but suitability on a customer by customer basis on a campaign by campaign basis.
>
> [...]
>
> So, it leverages our data to do that. And ***it's another way that we take core data points on brand safety, on suitability, on context, on viewability, on attention, and leverage those in a way, in a pre-bid fashion to help optimize an advertiser spend and help them drive more spend***.

82. Defendant Zagorski also made the following statement about DoubleVerify's Activation Services revenue during the KeyBanc Emerging Technology Summit:

> So, I think the opportunity is one in which we've said, multiples larger than it is today. It'll take time. ***We have upselling to do. We still have additional volume and growth to go after.*** And the iteration of the product that we've launched in brand safety on Meta is just iteration one, that's important to know.
>
> Any product that we launch across a walled garden usually starts with a basic version and then ends up in a much more granular detail version down the road as we move into areas like brand suitability, more granularity and reporting back on suitability violations and etcetera.

83. On March 7, 2024, Defendant Zagorski and Defendant Allais participated in the Morgan Stanley Technology, Media & Telecom Conference. Defendant Allais made the following statement about DoubleVerify's Activation Services revenue:

> The drivers of the growth that we see right now, social is only on the measurement side right now, right. So, the walled gardens where the walled

> gardens are providing a level of brand safety that we can then measure for our advertisers. So, ***social is a measurement that is the area that we see the most growth in the short term***. I'm sure we'll talk about Meta and brand safety, brand suitability, that's the driver. Pre- bid, we have premium-priced products there that are unique in the market that are continuing to create a lot of growth for us. So ABS, which Mark really mentioned is premium-priced product. ***Two thirds of the growth that we saw last quarter was from existing customers continuing to use our service on more and more impressions, that's a five-year-old product. So, we have a lot of drivers. I think short term, social is really where we see this huge growth***.

84. On May 7, 2024, in connection with its first quarter 2024 earnings report, DoubleVerify surprised analysts by cutting its full-year 2024 revenue outlook due to customers that were pulling back on their ad spending. On this news, DoubleVerify's stock price dropped $11.79 per share, or 38.6 percent, from a closing price of $30.57 on May 7, 2024 to a closing price of $18.78 on May 8, 2024.

85. While this news further revealed Defendants' fraud, DoubleVerify continued to mislead investors. On the same day, the Company issued a press release announcing its results for the first quarter ended March 31, 2024 and disclosed quarterly revenue of $140.8 million. In the press release, Defendant Zagorski was quoted as stating that "***We enhanced and scaled our independently accredited core verification and performance solutions across leading social and CTV platforms***, grew the adoption and usage of Scibids AI, and expanded our international businesses through global partnerships with large new and existing advertisers, all of which ***drove strong revenue growth and profitability***."

86. On the same day, the Company hosted an earnings call for the first quarter of 2024 (the "Q1 2024 Call"). In the prepared remarks portion of the Q1 2024 Call, Defendant Zagorski made the following statement about DoubleVerify's Activation Services:

> To conclude, we are witnessing strong growth in digital video, including CTV, social video and online video. We see this growth characterized by increasing ad spend on social video and CTV, which is primarily acquired through private

> marketplace for Programmatic Guaranteed and direct deals. ***For advertisers, this has meant navigating through more closed ecosystem, leading to greater fragmentation, complexity and challenges in implementing scalable strategies, interpreting data, evaluating performance and establishing trust across various networks***.
>
> Strong, independent verification of closed ecosystem is essential to maintaining accountability and sustaining buyer confidence. DV has extensive experience in harnessing the power of AI, machine learning, and data science, as well as building trusted, scalable solutions integrated across all platforms, whether open or closed. We measure data that correlates with the business outcomes advertisers aim to achieve, and we can activate that measurement data to help advertisers drive better outcomes.

87. On May 20, 2024, Defendant Zagorski and Defendant Allais participated in the J.P. Morgan Global Technology, Media and Communications Conference. Defendant Allais made the following statement about DoubleVerify's Activation Services revenue:

> If you think about it, even at the level of a specific product, if we take ABS, for example, which is our premium priced product on the activation side, only 60% of our top 500 clients use it. So that means there's an opportunity, even within our base, to continue to have more customers using it. And even within the base of customers that use it, this is the part that's hard to evaluate. But even within the piece of the pie that uses our product, there's probably another 40% or 50% of the business that still don't use ABS. So not only do we have customers that don't use it yet, but even the ones that use it don't necessarily use it on all their volumes. . . . They may have other brands, it might take time to get to certain geographies. So ***the opportunity to continue to penetrate there is pretty high for us***.

88. During the same conference, Defendant Zagorski made the following statement about the effectiveness of DoubleVerify's fraud detection techniques:

> When we do things like brand suitability measurement, we do so at a much more granular level than any other platform out there. We have more tiers of suitability and more levels of sensitivity than anybody else, which allows us to measure more granularly. On the fraud side, because we use deterministic fraud techniques and have our own Fraud Lab, which was the first in the industry, and I think it's pretty much the only one that's really at scale out there, ***we're able to identify fraud 8.5 times more effectively and efficiency than our competitors***.

89. During the same conference, Defendant Zagorski was asked about DoubleVerify's Activation Services revenue:

> Q: Mark R. Murphy, J.P.Morgan: Let me ask you one more, because I think this could be a great note to end on. What are your aspirations in social? What I mean by that is if you look at the market share that you could have in social and then you compare it to what your market share is very strong, very robust in your kind of pre-existing markets, is there any way to think that through or even just to think about how much of the social kind of walled garden inventory they would expose to you? Like, where could this be in 5 or 10 years?
>
> A: Defendant Zagorski: I mean, look, if you look at digital ad spend, something like 70% of it is social. Right now, 17% of our revenue is social. So we would like our business at some point to look like the ad spend business. If we're verifying everywhere, then ***we see a significant amount of upside coming from social. And I think we're just scratching the surface there***.

90. On June 4, 2024, Defendant Zagorski and Defendant Allais participated in the Baird Global Consumer, Technology & Services Conference. Defendant Zagorski made the following statement about DoubleVerify's Activation Services revenue:

> When we look at social, for example, our monetization is very heavily focused on measurement today, right? So the measurement, the post-bid side of that business. But I think ***there's opportunities for us to grow our activation business across social down the road***. We have a prescreen solution in market now for YouTube, which continues to grow and allows us to again make money on both the prescreen and the measurement parts of YouTube.
>
> ***We've got activation solutions now via our Scibids implementation across social networks that are just being launched. So we've got activation opportunities there too***. So I think right now when we look at social, it's very heavily measurement focused with ***significant activation opportunities down the road as we build more tools and as we penetrate more platforms***. When we look at CTV, it's a matter of we do both pre-bid and post-bid for CTV. I think there the monetization really has to do more with pricing versus penetration and product.

91. On July 30, 2024, DoubleVerify issued a press release announcing its results for the second quarter ended June 30, 2024 and disclosed quarterly revenue of $155.9 million. In the press release, DoubleVerify touted its "***strong performance was driven by multiple products across activation, measurement, and supply-side revenue that leveraged growth across social, CTV, and retail media environments***."

92. On the same day, the Company hosted an earnings call for the second quarter of 2024 (the "Q2 2024 Call"). In the prepared remarks portion of the Q2 2023 Call, Defendant Zagorski made the following statement about DoubleVerify's Activation Services:

> As video content, whether short form, long form or CTV, becomes the primary way that consumers engage with the Internet and advertisers reach consumers, ***DV has developed the industry's most effective and cost-efficient solutions to verify that those video ad interactions are viewable, secure and suitable, positioning us perfectly to continue to further capitalize on this trend***. Moreover, with digital ad spend outside the United States growing at nearly double the rate of domestic growth per Magna Global, DV has invested in more global resources than any other company in our sector, positioning us to take full advantage of this trend. Building on these achievements, ***our accelerated momentum is evident in numerous our RFPs we won in the first half of the year and in an enterprise deal pipeline that has never been stronger with greenfield and competitive opportunities set to fuel our resurgent measurement and leading activation businesses for the next several quarters***.
>
> [...]
>
> Based on our unmatched scale and differentiated solution set, we are also seizing a prime opportunity to gain market share and extend our industry leadership. With Oracle shutting down operations of Moat and Grapeshot on September 30, we've already attracted interest from many of their advertiser and platform customers who recognize DoubleVerify's differentiated, best-in-class capabilities across social activation, Scibids, CTV and retail media. ***While we anticipate closing many of these opportunities by yearend, the revenue impact will really kick in in early 2025 due to the time required for onboarding and ramp-up. Moreover, we expect these customers to grow well beyond 2025 as we typically up-sell from measurement to activation between the first and third years of new contracts***.

93. On the same day, the Company filed its earnings results for the second quarter of 2023 (the "Q2 2024 Call"). In the Q2 2024 10-Q, the Company stated that "There have been no material changes to the risk factors described in the section titled 'Risk Factors' in the [2023 10K]." The 2023 10-K contained the same risk disclosures discussed above.

94. On September 10, 2024, Defendant Zagorski and Defendant Allais participated in the Piper Sandler Growth Frontiers Conference. Defendant Allais made the following statement about DoubleVerify's Activation Services revenue:

> The way we help advertisers is both on the measurement side of the business, which is an ad runs and then we tell the advertiser how it did based on the criterias that we have. But we also help the advertiser now more and more on the activation side of the business, which is even before you bid on an ad, can you use our data to inform whether you're about to bid on a good placement or a bad placement? And so, we have measurement and activation, that's 90% of our revenue.
>
> ***The drivers of the growth on activation, which is the larger part of our revenue, it was a double-digit growth in Q2. What's happened recently is we've been able to open up activation for social. So, this is a new trend where we've been able to do activation for the open web for a long time, but now we're starting to do it on the social side. And that's been one of the drivers of the growth on the activation side***. We think it's long-term growth drivers, where we'll be able to replicate the success we've had with the open web with the social platform. And that business grew 12% in the quarter.

95. On September 12, 2024, Defendant Zagorski and Defendant Allais participated in the Goldman Sachs Communacopia Technology Conference. Defendant Allais was asked about execution hurdles for DoubleVerify's Activation Services revenue:

> Unlike the open web, it's going to be an integration platform by platform. So that alone tells you it's going to take a bit of time. **The good news for us** is we already have this for YouTube. We have a product in the market. It's a prescreen tool. It already exists on YouTube. ***We've been in market with this for several years. So we know what the model looks like. We know what the data is that we need. We need to replicate that with every other platform. Your question is the timing.***
>
> [...]
>
> The timing is depending on the platforms wanting to kind of get there and understanding the power of the tool. So it's a business development effort, the technology, and the knowhow. We know how to do it on YouTube. So it'll take a little bit of time to understand how each platform is different, but it's really about when the platform is ready to work on it. So we're working with three platforms. The big one will be Meta, and since they just launched, the measurement side, ***it is going to take a little bit of time from business development to kind of get there***.

96. On November 6, 2024, DoubleVerify issued a press release announcing its results for the second quarter ended September 30, 2024 and reported quarterly revenue of $169.6

million. In the press release, DoubleVerify touted its "***Double-Digit Growth Across All Revenue Lines as Advertisers and Platforms Expand Adoption of DV's Solutions***."

97. The same day, the Company hosted an earnings call for the quarter (the "Q3 2024 Call"). During the Q3 2024 Call, Defendant Zagorski reiterated that:

> This year, ***the industry shift towards outcome-driven platforms, especially those in social media, has accelerated the demand for performance-based solutions***. Make no mistake, real performance starts with protection. Without it, ad spend is wasted on fraudulent, non-viewable impressions or placements that don't align with brand objectives. ***DV is uniquely positioned to integrate protection and media quality requirements with performance and media efficacy objectives***, creating powerful solutions that today's advertisers demand. While this transition may have a near-term impact on core growth, ***as we unified protection with performance on social media, our innovative solutions, including DV Authentic Attention and Scibids AI, continue to gain momentum to support long-term growth***.

98. On the same day, the Company filed its earnings results for the third quarter of 2023 (the "Q3 2024 Call"). In the Q3 2024 10-Q, the Company stated that "There have been no material changes to the risk factors described in the section titled 'Risk Factors' in the [2023 10K]." The 2023 10-K contained the same risk disclosures discussed above.

99. The statements above were materially false and misleading when made because they failed to disclose the following adverse facts:

a) DoubleVerify's customers were shifting their ad spending from open exchanges to closed platforms, where the Company's technological capabilities were limited and competed directly with native tools provided by platforms like Meta Platforms and Amazon;

b) DoubleVerify's ability to monetize on its Activation Services was limited because the development of its technology for closed platforms was significantly more expensive and time-consuming than disclosed to investors;

c) DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize;

d) DoubleVerify's competitors were better positioned to incorporate AI into their offerings on closed platforms, which impaired DoubleVerify's ability to compete effectively and adversely impacted the Company's profits;

e) DoubleVerify systematically overbilled its customers for ad impressions served to declared bots operating out of known data center server farms;

f) DoubleVerify's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

g) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

100. Defendants' fraud was further revealed on February 27, 2025, when DoubleVerify reported lower-than-expected fourth quarter 2024 sales and earnings due in part to reduced customer spending and the suspension of DoubleVerify services by a large customer. Defendants also disclosed that the shift of ad dollars from open exchanges to closed platforms was negatively impacting the Company.

101. In prepared remarks on a conference call to discuss quarterly earnings ("Q4 2024 Earnings Call"), Defendant Zagorski stated:

> Throughout the year, we navigated some isolated headwinds, **including scaled back ad spend from six large customers. And in Q4, one of our largest customers facing billions of dollars of sharply escalating commodity costs, dramatically reduced its spend with DV as part of a sweeping cost reduction initiative that also impacted their other advertising and marketing partners**. Although this customer has maintained limited engagement with DV while temporarily shifting to standard native tools within each tech platform, we have completely excluded them from our 2025 guidance to provide a realistic outlook

> for the year ahead. These factors, combined with the absence of a post-election rebound in ad spend, resulted in a disappointing Q4 that fell short of our expectations.
>
> Beyond these isolated customer challenges, **we also saw the continued shift of ad dollars from open web, programmatic to proprietary platforms like social, where most of our activation solutions were unavailable until early this year**. And spending in private marketplaces, PMPs, and direct programmatic guarantee deals, or PG, also started to accelerate temporarily limiting advertiser's ability to attach DV solutions to every transaction.

102. During the Q4 2024 Earnings Call, Defendant Allais stated:

> In terms of opportunities, our guidance accounts for moderate growth in new social revenue, factoring in time for clients to test and onboard a newly launched social activation solution, a **one- to three-year period to upsell our premium solutions** to the Moat clients that we on-boarded in Q4 2024, and a measured in-year revenue upside from Rockerbox as we prioritize the integration of product and operations in 2025.

103. On this news, DoubleVerify's stock price dropped $7.83 per share, or approximately 36.0%, from a closing price of $21.73 on February 27, 2025 to a closing price of $13.90 on February 28, 2025.

104. Analysts were shocked by the news. For example, analysts at Truist Securities noted that DoubleVerify's revenue suffered from "more ad spend going towards private marketplace and programmatic guaranteed on proprietary platforms (i.e. walled-gardens, particularly social) at the expense of the open web." Analysts at Goldman Sachs downgraded their rating and lowered the price target from $24 to $20, noting "a slower upsell environment from new customer wins."

105. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, stockholders and the Company have suffered significant damages.

**The 2024 Proxy Statement**

106. On April 10, 2024, DoubleVerify filed its 2024 Proxy Statement, the 2024 Proxy Statement was Solicited by Defendants Zagorksi, Desmond, Perez, Noell, Dobrin, Swidler, Jain, Turner, and Wagner. The 2024 Proxy Statement solicited shareholder to vote on, among other things: (i) the election of four Class III directors for a three-year term ending at 2027 Annual Meeting of Stockholders; (ii) a non-binding advisory vote on the compensation for the Company's named executive officers; (iii) the ratification of the appointment of Deloitte & Touche LLP ("Deloitte") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024; and (iv) any other such business that properly came before the Annual Meeting.

107. Concerning the Board's role in risk oversight, the 2024 Proxy Statement stated:

> The Board as a whole has responsibility for overseeing our risk management. The Board exercises this oversight responsibility directly and through its committees. The oversight responsibility of the Board and its committees is informed by reports from our management team and from our internal audit department that are designed to provide visibility to the Board about the identification and assessment of key risks and our risk mitigation strategies. The full Board has primary responsibility for evaluating strategic and operational risk management, and succession planning, and reviews our enterprise risk assessment on at least an annual basis. Our Audit Committee has the responsibility for overseeing our major financial and accounting risk exposures and the steps our management has taken to monitor and control these exposures, including policies and procedures for assessing and managing risk, including oversight on compliance related to legal and regulatory exposure and meets regularly with our Chief Legal Officer. Our Audit Committee also reviews and discusses with management the adequacy and effectiveness of the Company's information and technology security policies and the internal controls regarding information and technology security, cybersecurity and privacy related areas. Our Compensation Committee evaluates risks arising from our compensation policies and practices, as more fully described below. The Audit Committee and Compensation Committee provide reports to the full Board regarding these and other matters.

108. Within the 2024 Proxy Statement, Defendants failed to acknowledge the serious issues facing the Company's ad business. Specifically:

h) DoubleVerify's customers were shifting their ad spending from open exchanges to closed platforms, where the Company's technological capabilities were limited and competed directly with native tools provided by platforms like Meta Platforms and Amazon;

i) DoubleVerify's ability to monetize on its Activation Services was limited because the development of its technology for closed platforms was significantly more expensive and time-consuming than disclosed to investors;

j) DoubleVerify's Activation Services in connection with certain closed platforms would take several years to monetize;

k) DoubleVerify's competitors were better positioned to incorporate AI into their offerings on closed platforms, which impaired DoubleVerify's ability to compete effectively and adversely impacted the Company's profits;

l) DoubleVerify systematically overbilled its customers for ad impressions served to declared bots operating out of known data center server farms;

m) DoubleVerify's risk disclosures were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; and

n) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially false and/or misleading or lacked a reasonable basis.

109. The Proxy statement was materially false and misleading when made because they failed to disclose the above referenced facts.

110. Furthermore, the 2024 Proxy Statement was also false and misleading as it failed to disclose that the Company did not in fact maintain proper internal controls as it pertained to risk management. Due to this, the 2024 Proxy Statement was materially false and misleading.

**DEFENDANTS' ILLICIT INSIDER SALES**

111. During the Relevant Period, as Defendants promoted the Company's stock through false and misleading statements, Defendants Allais, Desmond, and Noell (the "Insider Selling Defendants") capitalized on artificially inflated stock price by selling portions of their holdings in DoubleVerify stock.

112. Specifically, during the Relevant Period, the Insider Selling Defendants collectively sold approximately 15,000,000 shares of DoubleVerify stock for total proceeds of approximately $456,683,631. The sales made by the Insider Selling Defendants during the Relevant Period were suspicious in timing and amount and were inconsistent with their pre- and post-Relevant period trading practices.

113. Defendant Allais collectively sold 193,248 shares of DoubleVerify stock for proceeds of approximately $5,362,959 in a series of transactions detailed below:

| Date | # of Shares | Avg. Price/Share | Approximate Total Proceeds |
|---|---|---|---|
| 11/13/23 | 9,231 | $29.95 | $276,461.99 |
| 11/14/23 | 9,231 | $30.94 | $285,561.91 |
| 11/27/23 | 9,231 | $31.95 | $294,899.06 |
| 11/28/23 | 9,231 | $32.15 | $296,792.34 |
| 12/12/23 | 9,231 | $33.33 | $307,633.23 |
| 12/13/23 | 9,231 | $34.91 | $322,280.06 |
| 12/27/23 | 9,231 | $37.47 | $345,844.03 |
| 12/28/23 | 9,225 | $37.49 | $345,819.42 |
| 3/18/24 | 5,364 | $32.80 | $175,918.28 |

| | | | |
|---|---|---|---|
| 3/19/24 | 5,292 | $33.55 | $177,565.65 |
| 3/25/24 | 5,292 | $33.55 | $177,531.78 |
| 3/26/24 | 5,292 | $33.46 | $177,043.86 |
| 4/11/24 | 5,292 | $33.38 | $176,664.95 |
| 4/12/24 | 5,292 | $32.53 | $172,140.29 |
| 4/23/24 | 5,292 | $29.69 | $157,109.95 |
| 4/24/24 | 5,292 | $30.86 | $163,288.89 |
| 5/13/24 | 1,764 | $19.03 | $33,566.27 |
| 5/14/24 | 1,764 | $19.42 | $34,256.88 |
| 5/20/24 | 1,764 | $19.57 | $34,523.77 |
| 5/21/24 | 1.764 | $18.79 | $33,152.44 |
| 6/3/24 | 1,764 | $18.37 | $32,412.79 |
| 6/4/24 | 1,764 | $17.88 | $31,540.67 |
| 6/17/24 | 1,764 | $18.71 | $33,004.97 |
| 6/18/24 | 1,764 | $18.73 | $33,034.08 |
| 7/8/24 | 1,764 | $20.05 | $35,364.32 |
| 7/9/24 | 1,764 | $20.02 | $35,317.04 |
| 7/18/24 | 1,764 | $20.16 | $35,568.77 |
| 7/19/24 | 1,764 | $19.48 | $34,361.84 |
| 8/5/24 | 1,764 | $19.25 | $33,948.53 |
| 8/6/24 | 1,764 | $19.22 | $33,908.14 |
| 8/20/24 | 1,764 | $19.29 | $34,034.97 |

| | | | |
|---|---|---|---|
| 8/21/24 | 1,764 | $19.32 | $34,078.19 |
| 9/12/24 | 1,764 | $17.89 | $31,564.13 |
| 9/13/24 | 1,764 | $17.42 | $30,730.29 |
| 9/26/24 | 1,764 | $16.94 | $29,889.39 |
| 9/27/24 | 1,764 | $17.28 | $30,490.21 |
| 10/4/24 | 1,764 | $16.92 | $29,843.88 |
| 10/7/24 | 1,764 | $17.21 | $30,365.14 |
| 10/22/24 | 1,764 | $17.25 | $30,430.41 |
| 10/23/24 | 1,764 | $16.41 | $28,951.30 |
| 11/14/24 | 1,764 | $20.30 | $35,802.50 |
| 11/15/24 | 1,764 | $19.73 | $34,795.43 |
| 11/21/24 | 2,274 | $20.01 | $45,512.52 |
| 11/22/24 | 2,220 | $20.09 | $44,594.47 |
| 12/9/24 | 2,220 | $20.41 | $45,306.43 |
| 12/10/24 | 2,220 | $20.44 | $45,368.36 |
| 12/17/24 | 1,667 | $20.06 | $33,442.85 |
| 12/18/24 | 2,071 | $20.51 | $42,468.55 |
| 2/3/25 | 11,802 | $21.40 | $252,553.36 |
| 2/4/25 | 2,220 | $21.61 | $47,984.19 |
| 2/10/25 | 2,220 | $21.91 | $48,650.19 |
| 2/11/25 | 2,220 | $22.34 | $49,585.92 |

114. Defendant Desmond collectively sold 518,225 shares of DoubleVerify stock for proceeds of approximately $16,065,440 in a series of transactions detailed below:

| Date | # of Shares | Avg. Price/Share | Approximate Total Proceeds |
|---|---|---|---|
| 11/14/23 | 11,003 | $31.33 | $344,726.19 |
| 11/15/23 | 436,745 | $31.69 | $13,839,051.47 |
| 11/28/23 | 11,002 | $32.19 | $354,142.28 |
| 12/12/23 | 11,003 | $33.34 | $366,857.62 |
| 12/26/23 | 11,002 | $37.39 | $411,344.98 |
| 11/21/24 | 37,500 | $19.98 | $749,317.50 |

**115.** Defendant Noell collectively sold 14,375,000 shares of DoubleVerify stock for proceeds of approximately $435,203,125 in a series of transactions detailed below:

| Date | # of Shares | Avg. Price/Share | Approximate Total Proceeds |
|---|---|---|---|
| 11/15/23 | 12,419,953 | $30.28 | $376,014,077.08 |
| 11/15/23 | 80,047 | $30.28 | $2,423,422.93 |
| 11/27/23 | 1,862,992 | $30.28 | $56,402,082.80 |
| 11/27/23 | 12,008 | $30.28 | $363,542.20 |

## DAMAGES TO THE COMPANY

116. DoubleVerify has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, DoubleVerify has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a. costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b. substantial loss of market capital;

c. costs already incurred and to be incurred defending the pending securities fraud class action lawsuit; and

d. any fines or other liability resulting from the Company's violations of federal law.

117. In addition, DoubleVerify's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

118. The wrongdoing complained of herein has irreparably damaged DoubleVerify's corporate image and goodwill. For at least the foreseeable future, DoubleVerify will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that DoubleVerify's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

119. Plaintiff brings this action derivatively in the right and for the benefit of DoubleVerify to redress injuries suffered, and to be suffered, by DoubleVerify as a direct result of violations of federal securities laws by the Defendants. DoubleVerify is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120. The Board of DoubleVerify, at the time this action was commenced, consisted of Defendants Noell, Desmond, Dobrin, Jain, Perez, Swidler, Turner, Wagner, Zagorski, and Related Party Non-Defendant Storms a total of ten (10) individuals.

121. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the DoubleVerify Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

122. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

123. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Zagorski Because His**
**<u>Principal Professional Occupation as the Company's CEO</u>**

124. Defendant Zagorski joined the Company as CEO in 2020 and has been a member of the Board since then. As such, it is reasonable to infer that due to the importance of the Company's ad services business to its bottom line, Defendant Zagorski would have been aware of the Company's related struggles, including but not necessarily limited to the shift in customer

ad spending to closed platforms, competitor's ability to more efficiently implement AI into their products, and the Company's systemic overbilling of its customers. In his role as CEO of the Company for the fiscal years of 2023 and 2024, Defendant Zagorski received $10,810,668 and $1,077,618 in total compensation, respectively. The Company does not claim that Defendant Zagorski is an independent director and because his primary source of income and primary employment is his employment as CEO of DoubleVerify, and his professional reputation is inextricably bound to his role at DoubleVerify, Defendant Zagorski is thus incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Insider Selling Board Members**

125. Making a demand on Defendants Desmond and Noell (the "Insider Selling Board Members") would be a futile and useless act as those defendants directly benefitted from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their illicit insider stock sales detailed above and cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

126. The Insider Selling Board Members made such illicit trades during the Relevant Period by wrongfully benefitting from the Company's artificially inflated stock price at the expense of the Company's shareholders. Throughout the Relevant Period, Defendants misled the investing public regarding the true business prospects of the Company. When the truth finally emerged, the Company's stock plummeted, but only after the Insider Selling Board Members had substantially benefitted by selling significant portions of their stock at higher prices.

127. Specifically, during the Relevant Period, the above-named Insider Selling Board members sold significant portions of their DoubleVerify stock, reaping significant proceeds.

128. The Company has adopted an Insider Trading Compliance Policy (the "Insider Policy") to provide guidance with respect to the trading of the Company's securities. The Insider Policy provides that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

129. As a result, the Insider Selling Board Members have violated the Company's Insider Trading Compliance Policy and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them interested in considering demand.

**Demand is Futile as to the Audit Committee Members**

130. Demand is futile as to Defendants Perez, Swidler, and Turner (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

131. The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties of the Audit Committee are set further herein, *supra*.

132. Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

133. The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the Company's ad business and related functions. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring

that these reports did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

134. Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

135. Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

136. Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

137. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

**COUNT I**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

138. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

140. Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

141. Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose to investors that: (i) the Company's customers were shifting their spending primarily to closed ad platforms; (ii) the Company's ability to monetize its activation services on closed platforms was extremely limited and would take years to utilize; (iii) the

Company was overbilling its customers for ad impressions from known data center server farms; and (iv) as a result, the Company's public statements were materially false and misleading. Furthermore, the 2024 Proxy Statement falsely represented that the board was conducting appropriate risk oversight.

142. The 2024 Proxy Statement was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operation, and prospects in relation to the conduct alleged herein.

143. The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to, the re-election of the Company's directors.

144. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

145. Plaintiff, on behalf of DoubleVerify has no adequate remedy at law.

**COUNT II**

**Against the Securities Action Defendants**
**for Contribution Under Section 10(b) of the Exchange Act,**
**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

146. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

147. As a result of the conduct and events alleged above, DoubleVerify has been

named as a defendant in the Related Securities Action brought on behalf of DoubleVerify shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

148. Federal law provides DoubleVerify with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, DoubleVerify has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling DoubleVerify to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

149. Accordingly, Plaintiff, on behalf of DoubleVerify, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with DoubleVerify under Rule 10b-5, or if joined in such actions, would be liable for the same damage as DoubleVerify.

**Allegations Regarding Securities Action Defendants**

150. Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased DoubleVerify securities during the Relevant Period.

151. The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing

DoubleVerify securities, and, as a result, suffered damages because the value of their investments was distorted by the false and materially omissive statements, and they purchased securities at such distorted prices.

152. The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholder's investments to drop.

153. The Plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

154. When the Securities Action Defendants signed off on or made the false and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of DoubleVerify, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements were in fact false and misleading when made.

155. Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if DoubleVerify were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right to contribution on behalf of DoubleVerify.

**Allegations Regarding the Securities Action Defendants as Control Persons**

156. In acting as alleged above, the Securities Action Defendants were acting as authorized agents of DoubleVerify in their roles as directors and/or employees. Because of their

positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of various reports, press releases, and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

157. The Securities Action Defendants were "controlling persons" of DoubleVerify within the meaning of Section 20(a) of the Exchange Act, and accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

158. Plaintiff hereby derivatively claims such right on behalf of DoubleVerify.

**COUNT III**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

159. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160. The Individual Defendants owed and owe DoubleVerify fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe DoubleVerify the highest obligation of good faith, loyalty, and due care.

161. The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to DoubleVerify shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

162. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet

the Individual Defendants caused DoubleVerify to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to DoubleVerify and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

163. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

164. Plaintiff, on behalf of DoubleVerify, has no adequate remedy at law.

**COUNT IV**

**Against all the Individual Defendants for Unjust Enrichment**

165. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of DoubleVerify.

167. The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to DoubleVerify.

168. Plaintiff, as a shareholder and representative of DoubleVerify, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

169. Plaintiff, on behalf of DoubleVerify, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants for Abuse of Control**

170. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171. The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of DoubleVerify and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

172. As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

173. Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

**COUNT VI**

**Against the Individual Defendants for Gross Mismanagement**

174. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175. The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

176. Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders

in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

177. By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of DoubleVerify's affairs and in the use and preservation of DoubleVerify's assets.

178. During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused DoubleVerify to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to DoubleVerify, thus breaching their duties to the Company.

179. As a result, the Individual Defendants grossly mismanaged DoubleVerify and should be liable to the Company for the resulting damages.

**COUNT VII**

**Against the Insider Selling Defendants for Breach**
**<u>of Fiduciary Duty for Insider Selling and Misappropriation of Information</u>**

180. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181. The Insider Selling Defendants (defined *supra*), throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public. The Insider Selling Defendants engaged in this course of conduct to keep the public unaware of the adverse information affecting the Company's stock price and benefitted to the detriment of the investing public and the Company itself.

182. This proprietary, non-public information concerning the Company's business and prospects was known by the Insider Selling Defendants, who sold substantial amounts of their shares in DoubleVerify stock during the period Defendants' fraud was ongoing. These sales were made for Defendants own self-interests, at the expense of DoubleVerify and the investing public.

183. By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

184. As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from their sales of the stock in DoubleVerify.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of DoubleVerify and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to DoubleVerify the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing DoubleVerify and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DoubleVerify and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to

ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to DoubleVerify exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding DoubleVerify restitution from Defendants, and each of them;

F. Awarding DoubleVerify contribution from the Securities Action Defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: December 9, 2025

Respectfully submitted,

By: *<u>/s/ Joshua M. Lifshitz</u>*

Joshua M. Lifshitz
**LIFSHITZ LAW PLLC**
1190 Broadway
**Hewlett, NY 11557**
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*

**VERIFICATION**

I, Susana Kaszirer hereby declare as follows:

I am shareholder of DV and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed on 12/05/2025



Signature